(C. D. 1258)

NORMAN G. JENSEN
WAVERLY SUGAR COMPANY } *v.* UNITED STATES

United States Customs Court, Second Division

(Decided July 11, 1950)

*John Irwin Dugan* for the plaintiffs.

*David N. Edelstein*, Assistant Attorney General (*Richard H. Welsh*, special attorney), for the defendant.

Before LAWRENCE and RAO, Judges; FORD, Judge, not participating

LAWRENCE, Judge: Certain filter press plates and frames imported from Canada were classified by the collector of customs as "Articles or wares not specially provided for, * * * if composed wholly or in chief value of iron, steel, * * * or other metal" within the scope of paragraph 397 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 397) and duty thereon was accordingly assessed at the rate of 45 per centum ad valorem.

It is the plaintiffs' sole contention that the importation should have been assessed with duty at 27½ per centum ad valorem as "parts" of machines, finished or unfinished, not specially provided for, within the purview of paragraph 372 of said act (19 U. S. C. § 1001, par. 372).

At the trial of this case, the testimony of two witnesses for the plaintiffs was presented and there were received and marked in evidence plaintiffs' exhibits 1, 2, 3, and 4. Exhibits 1 and 2 are invoices of the Vulcan Iron Works, Limited, Winnipeg, Manitoba, Canada; exhibit 3 is a photograph; and exhibit 4 is a blueprint of a complete filter press.

The first witness to appear on behalf of the plaintiffs, Walter R. Page, stated that he had served as vice president of the Waverly Sugar Company. He identified exhibits 1 and 2 as invoices issued by the Vulcan Iron Works, Limited, in Winnipeg, Manitoba, Canada (the exporter of the controverted merchandise), each covering one complete set of filter press plates and frames, and exhibit 3 as a photograph of a Sperry Filter Press with a hydraulic closing device and one extra plate and frame, marked "P" and "F," respectively, to illustrate the plates and frames in question.

Henry E. Jacoby, a mechanical engineer in the employ of D. R. Sperry & Co. for the past 30 years, upon being called as plaintiffs' second witness, testified that he had specialized in chemical process equipment, principally filtration apparatus, and identified exhibit 3 as illustrative of a filter press of which the present importation forms a part. He stated that he was familiar with the operation of the machine depicted in exhibit 3 and blueprinted in exhibit 4 and that it is as follows:

The machine is made of what we call the skeleton or framework, which is the body of the machine proper. In it are a series of alternating plates and frames, between which are a series of either cloths or other filter medium, through which the solution to be filtered is forced. They alternate, plates, frame, plates and frame, between the two main heads of the machine. When they are as we called dressed, the electric motor is started, which operates a hydraulic pump, pumping oil into this cylinder——

Q. Pointing to the cylinder which is on the head?—A. What we call the closing cylinder.

Q. Will you draw a circle in ink around the closing device on the machine on Exhibit 3 and mark it "C"?—A. (Witness complies with instructions.) The closing cylinder moves the head and clamps all of the plates and frames in position to the degree that the joints between them are liquid tight. The solution, in this case a sugar solution, is then pumped into one end of the press. There it is divided into a series of branch openings which flow into these frames and turn through the cloth on to the plate and discharge through a series of discharge spigots, what we designate as the "cock outlet" on the drawing. The residue, whether dirt, impurities, or whatever it may be, remains behind in the frame on the filter cloth. When that operation is completed, the closing operation is reversed by reversing the motor, moving the head back, and each plate is then moved forward, the frame in turn cleaned out, the cloths taken out—sometimes washed out with a hose in the machine, and they are ready for the next operation.

With regard to the automatic closing device, the witness testified as follows:

Q. Looking at Exhibit 4, will you please describe to the court the automatic closing device which is a part of the filter press machine in question?—A. To move the head in order to close up the press, there is a shaft or rod, which we call the ram, between this head and a piston in a hydraulic cylinder. [At this point the witness outlined the piston in question on exhibit 4 and marked it "Piston."] In order for that piston to move forward and push this head, oil under pressure is pumped into the cylinder behind it. That pumping is accomplished by a motor driven pump in this box, marked "Motor Box". That pump driven by that motor forces oil under pressure of approximately 800 to a thousand pounds per square inch, pushes that piston forward, and thereby moves this head forward to close up this unit and make the joints water-tight so that the filtration will not leak all over the place.

He stated further that the automatic closing device, consisting of an electric motor and a hydraulic pump, is permanently attached to the machine and constitutes an integral part thereof; that this particular machine would not function without the closing device; that the automatic closing device does not function while the process of filtering is going on but that it is just for closing or sealing "to put the machine you might say in condition to operate," and to release or open the plates after the filtration to permit cleaning; and that the liquid to be filtered is pumped into the filter press by a separate pump. With reference to the supply pump, the witness stated:

There are two pumps in question; the hydraulic pump which moves the part of the machine and is built permanently into the machine. The other pump, which delivers the sugar solution which is to be filtered, is not built into the

machine. The motor and pump which produces the hydraulic pressure are integral parts of the machine.

He further stated that there are 70 frames and 69 plates on the apparatus represented by exhibit 3 and they do not in themselves have any mechanically operating features.

At the conclusion of the plaintiffs' case, the Government did not introduce any evidence. However, a motion was made on its behalf to dismiss protest 141442–K as untimely. The motion being uncontested, and an examination of the record disclosing that said protest was not filed within 60 days after liquidation of the entry, as required by section 514 of the Tariff Act of 1930 (19 U. S. C. § 1514), the motion is granted and protest 141442–K of Norman G. Jensen is accordingly hereby dismissed.

There remains for decision on the merits protests numbered 141443–K and 141444–K of Waverly Sugar Company, hereinafter referred to as plaintiff. The defendant in its brief virtually concedes that the classification of the importations by the collector under paragraph 397, *supra*, is erroneous, stating—

The filter presses of which the imported plates and frames are parts are articles having as an essential feature an electrical element, within the purview of paragraph 353, *supra*. Consequently, the imported plates and frames are parts of articles having as an essential feature an electrical element. Paragraph 353, *supra*, being more specific than the catch-all provisions of paragraph 372, *supra*, under which plaintiff claims, it follows that even though the Collector's classification is erroneous, the importer's claim is not right. In consequence, whereof, the protests filed herein should be overruled without approving the Collector's classification.

In support of its contention, defendant cites *United States* v. *Dryden Rubber Co.*, 22 C. C. P. A. (Customs) 51, T. D. 47050; *Ralph C. Coxhead Corp.* v. *United States*, 22 C. C. P. A. (Customs) 96, T. D. 47080; and *John A. Steer & Co.* v. *United States*, 24 C. C. P. A. (Customs) 293, T. D. 48737. In the *Dryden* and *Coxhead* cases, *supra*, our appellate court set forth the principles governing the application of paragraph 353 of the Tariff Act of 1930, which paragraph was a new provision in tariff legislation. In the *Dryden* case, in discussing the meaning of the third provision of said paragraph, namely—

Articles having as an essential feature an electrical element or device, such as electric motors, fans, locomotives, portable tools, furnaces, heaters, ovens, ranges, washing machines, refrigerators, and signs;

the court stated:

There are two inquiries, therefore, when the question of the classifiability of an article under this division of the paragraph is under consideration: First, is it essentially an electrical article? The electrical feature must be an essential feature, without which the article will not function, normally, for the purposes intended, for, it must be manifest, that if it be not an electrical article, it does not

come within the division at all. Second, if it is such an electrical article, is it an article named in the language, or within the class of articles named in this paragraph?

In applying these principles to the *Steer* case, *supra*, the appellate court was lead to a conclusion which, by analogy, must be conclusive of this phase of the case now before us. The *Steer* case involved the proper classification of an anhydrous ammonia plant composed of compressors, heaters, tanks, condensers, and refrigerators, used in the production of liquid anhydrous ammonia from two gases, hydrogen and nitrogen, by a process of synthesis. The apparatus constituted an entirety and was classified by the collector under the provision for "articles having as an essential feature an electrical element or device, such as electric * * * heaters" in paragraph 353 of the Tariff Act of 1930. The importer thereof claimed the mechanism to be properly dutiable under paragraph 372 of said act as "all other machines, finished or unfinished." The trial court found that the imported apparatus was within the purview of said paragraph 353 because of the presence of two heating units, and not because of any other electrical feature in the assembly. The purpose of said heating units was described by the appellate court as follows:

Aside from the motor which is used as above stated to drive the compressor, there are two other electrical elements, namely, two heaters. These are used in the operation of the plant as follows: In each heater there is a ribbon of Ni-chrome. This ribbon is suspended with suitable insulators in a forging in the shape of a hollowed-out vessel. When it is desired to start the apparatus, an electric current passes through these ribbons of Ni-chrome and heats the same so that the gas, in going into the synthesis vessel, passes the heaters and becomes warm enough for the ammonia reaction to start. As soon as the reaction starts, it is self-perpetuating, enough heat being derived from the process of synthesis to keep the operation going. As soon as the reaction starts, these electrical heaters are turned off and are no longer used except when it is again necessary to start the process.

After reviewing the principles laid down in the *Dryden* and *Coxhead* cases, *supra*, the court stated:

* * * The particular devices which are named in the statute as exemplars, are devices which are operated electrically, and which are able to function because of their electrical elements. That is true only in a very small degree in the case of an anhydrous ammonia plant, such as the one here imported. The continuance of its operation does not at all depend upon an electrical element. It has, it is true, an electrical heating element by which the synthesis of the gases is inaugurated, but so, to the same extent, does a gasoline automobile which has its electrical starting device, or an oil burner for a furnace which has its spark plug to start ignition. Yet we dare say no one would seriously contend that such devices should be classified within paragraph 353, even though there were no specific provisions for automobiles or oil burners within the tariff act. Such devices would still be gasoline automobiles and oil furnaces. In other words, they would not be electric machines, and the articles, to be classified under the third subdivision of said paragraph 353, are, as we said in the *Dryden Rubber Co.* case,

*supra,* required to be electric machines; that is, machines where the essential operating power of the device is electricity.

The judgment of the trial court was accordingly reversed and the cause remanded with directions to order reliquidation of the entry on the basis of classification as a machine within the purview of paragraph 372, *supra.*

It is our view that since the limited operation of the electrical units was sufficient to remove the machine in the *Steer* case from the provisions of paragraph 353, *supra,* by the same token, the limited operation of the electric motor and hydraulic pump in the functioning of a filter press likewise deprives the machine of which the imported filter plates and frames are essential and integral parts from classification in said paragraph 353. As disclosed by the evidence referred to above, prior to the filtering operation, which is the prime function of filter presses, an automatic closing device, consisting of a hydraulic pump powered by an electric motor, presses the filter plates and frames together to "make the joints water-tight so that the filtration will not leak all over the place." The electric motor is then shut off and remains inoperative during the filtering process and is only turned on again if it is necessary to re-tighten the plates or for cleaning purposes.

It is, therefore, evident that a filter press of the type here under consideration does not meet the requirements laid down in the *Dryden* case, *supra,* as reiterated in the *Steer* case, *supra,* that machines to be classified under the third subdivision of paragraph 353, *supra,* with which we are here concerned, must be "electric machines; that is, machines where the essential operating power of the device is electricity."

In the light of the foregoing considerations, we find untenable the contention of defendant that the filter plates and frames in controversy are parts of articles having as an essential feature an electrical element within the purview of said paragraph 353.

This conclusion, however, does not preclude classification of the importations as parts of machines, not specially provided for, in paragraph 372, *supra,* as claimed by the plaintiff. It is to that phase of the case we now direct our attention.

From the record and exhibits before us it is disclosed that the filter press with which we are here concerned consists of a skeleton principally comprising two horizontal metal rods supported at each end by vertical metal pieces. Attached to each end of the rods are so-called main heads; one head is fixed and the other moveable, the moveable head being designed to slide back and forth horizontally along the rods. Fitted to the rods in a vertical position are the plates and frames the subject of the present controversy, between which plates and frames either cloth or other filter medium is inserted. Permanently attached to, and an integral part of the apparatus, and

located at the end having the moveable head, is an electric motor, a hydraulic pump, a cylinder, and a piston for causing the moveable head to slide horizontally along the rods, so as to compress or release the plates, frames, and filter material, as desired.

It is evident from the foregoing description that in itself the filter press constitutes a machine in that it is a mechanical contrivance which by means of the electric motor and hydraulic pump, which are permanently attached and essential to its functioning, utilizes, applies, or modifies energy or force. *Simon, Buhler & Baumann (Inc.)* v. *United States*, 8 Ct. Cust. Appls. 273, T. D. 37537.

Filter presses in some respects similar to those here under consideration were the subject of *United States* v. *J. E. Bernard & Co., Inc.*, 28 C. C. P. A. (Customs) 182, C. A. D. 142, which, as pointed out in the brief of plaintiff, is clearly distinguishable. The filters there in issue were claimed to be parts of a machine within the meaning of paragraph 372, *supra*. The apparatus of which the filters were claimed to be parts consisted of three general units, namely, a pump, a filter, and a container-filling device. The pump, which was not an integral part of the device but an independent mechanism, forced the liquid out of a tank into, or through, the filter sheets that were between filter plates embraced in a frame, and thence to the container-filling unit. The court there found—

From the evidence in the case it is apparent that the filters are devices which possess no mechanically operating features. Liquids are conveyed to and forced through them by an independent mechanism—a pump—which, so far as the record discloses, might readily be used for pumping in other connections. After passing through the filters, the liquids are conveyed by means of tubes to a container-filling device which, so far as the record shows, might be used for the same purpose in an entirely different relationship. While the combined units may fall within the broad designation of machinery, it must be borne in mind that there is a distinction between "machinery" and "machines," and that paragraph 372, *supra*, while providing for parts of machines does not provide for parts of machinery.

The judgment of the trial court sustaining the claim of plaintiff in that case for classification of the importation within the purview of paragraph 372 of the Tariff Act of 1930 was accordingly reversed.

In the present case, however, the filter press under consideration does possess as integral parts thereof mechanically operating features, to wit, a hydraulic pump powered by an electric motor comprising the automatic closing device, and, as has been stated, *supra*, constitutes a machine as that term has been judicially determined.

Since it is not controverted that the filter plates and frames comprising the present importations are essential and necessary parts of such filter presses, we find and hold, upon the record as made, together with the concessions of defendant in its brief, that the claim of plaintiff for classification of the articles as "parts" of machines, finished or

34

unfinished, not specially provided for, as described in paragraph 372, *supra*, should be and hereby is sustained, and the merchandise covered by protests 141443–K and 141444–K is therefore held dutiable at the rate of 27½ per centum ad valorem.

Judgment will issue in accordance with the views above expressed.